W. O. BALDWIN, Trustee, Plaintiff,

v.

HARTFORD ACCIDENT AND INDEM-
NITY COMPANY, a corporation; Os-
borne Livestock Commission Company,
a partnership; Salina Sales Pavilion, a
partnership; Beverly Sales Company, a
partnership; Cloud County Livestock
Commission Company, a partnership;
Floyd E. Boyer; Anker Petersen; Lyle
Petersen; Lauritz M. Andersen; Ed
Baxa; Herman H. Thurnau; Adolph
Aden; Earl Werner; James Bailey;
Otto Kuhlmann; Louis Reinke; Monte
J. Harms; Norris Schardt; Arthur Pe-
terson; Melvin Schnegelberger, Defend-
ants (Vernon F. Kuhlmann and Wilma
Kuhlmann, Third-Party Defendants).

Civ. No. 62-52.

United States District Court
D. Nebraska.

March 1, 1958.

Supplemental Opinion April 14, 1958.

George A. Healey, Healey, Davies, Wilson & Barlow, Patrick W. Healey, Lincoln, Neb., for plaintiff.

L. J. Tierney, Cassem, Tierney, Adams, Kennedy & Henatsch, Omaha, Neb., for defendant Hartford Acc. & Indem. Co.

Guy C. Chambers, William C. Hastings, Chambers, Holland Dudgeon & Hastings, Lincoln, Neb., John Q. Royce, Hampton, Dunham, Royce & Engleman, Salina, Kan., for defendants Beverly Livestock Sales Co., Salina Sales Pavilion, and Osborne Livestock Commission Co.

Frank B. Morrison, Doyle, Morrison & Doyle, Lincoln, Neb., Charles A. Walsh, Concordia, Kan., for defendant Cloud County Livestock Commission Co.

Frank B. Morrison, Doyle, Morrison & Doyle, Lincoln, Neb., for defendants Ed Baxa, Herman H. Thurnau, Earl Werner, James Bailey.

N. A. Brubaker, Nelson, Neb., Cecil S. Brubaker, Lincoln, Neb., Lloyd Marti, Marti, O'Gara, Dalton & Sheldon, Lincoln, Neb., for defendants Louis Reinke, Floyd E. Boyer, Lauritz M. Andersen, Anker Petersen and Lyle Petersen.

George F. Johnson, Jr., Superior, Neb., for defendants Otto Kuhlmann, Monte J. Harms, Arthur Peterson, Adolph Aden and Norris Schardt.

Harvey W. Hess, Hebron, Neb., for defendant Melvin Schnegelberger.

Robert B. Waring, Geneva, Neb., for third-party defendants Vernon F. Kuhlmann and Wilma Kuhlmann.

DELEHANT, District Judge (serving by assignment).

Plaintiff, as designated trustee, instituted this action against defendant, Hartford Accident and Indemnity Company, a corporation, as the surety, on a bond given by Vernon F. Kuhlmann, doing business as Deshler Sales Company, of Deshler, Nebraska, as principal, in pursuance of the Packers and Stockyards Act of 1921, as amended, Title 7 U.S.C.A. § 201 et seq., to recover, for the use and benefit of the persons severally entitled thereto, the penal sum of the bond, namely $52,000, "together with interest thereon and a reasonable attorneys fee." Included, also, as defendants, when the case was started, were all of the other defendants above named, except Arthur Peterson, Melvin Schnegelberger, Vernon F. Kuhlmann and Wilma Kuhlmann, all of whom were brought into the action after its institution. Apart from the defendants, Vernon F. Kuhlmann and Wilma Kuhlmann, all defendants, other than Hartford Accident and Indemnity Company, were included as persons considered probably or possibly to hold beneficial rights under the bond sued upon.

Defendant, Hartford Accident and Indemnity Company, in its answer to the complaint, admitted its own corporate existence and its joinder in the execution of the bond in suit; but must be understood to have denied all other allegations of the complaint, and thus to have denied the alleged breach by the principal, Vernon F. Kuhlmann, doing business as Deshler Sales Company, of Deshler, Nebraska, of the conditions of the bond, demand by plaintiff for performance made upon the principal obligor in the bond, and damages within the coverage of the bond sustained by its own codefendants or any of them, or by other persons.

Of the defendants allegedly entitled to share beneficially in any recovery under the bond, the greater number served and filed answers and cross claims, or other pleadings setting up their respective claims; to which defendant, Hartford Accident and Indemnity Company served and filed responsive pleadings. But others allowed their respective positions to be presented by the plaintiff trustee.

With two significant reservations, trial of the issues presented by the pleadings has been had before the court without a jury. Those reservations are now identified. Floyd E. Boyer, one of the defendants, served and filed an answer and cross-complaint in which, adopting plaintiff's allegations touching the execution and terms of, and breach under, the bond, he denied such of the averments of the pleadings of some eleven of his claimant codefendants as were not admissions of facts pleaded in the complaint, and then set out in his own behalf a claim, allegedly within the coverage of the bond, in the sum of $22,499.71, with interest and costs, and demanded a trial by jury. Upon the trial to the court, the claim of defendant, Floyd E. Boyer, was not presented. It remains for trial hereafter, presumably before the court with a jury. Presently untried also are the issues made by the pleadings between the defendant and third-party plaintiff, Hartford Accident and Indemnity Company, and the third-party defendants, Vernon F. Kuhlmann and Wilma Kuhlmann.

By way of the interception of unnecessary repetition, and in anticipation of the court's early extensive factual recital and statement of its legal conclusions, it is observed that the court considers it unnecessary at this point, more thoroughly and in detail, to set out the issues made in the pleadings between the contending parties. This is true particularly in view of the failure of the pleadings themselves precisely to pinpoint the exact controversies between the parties.

It is first mentioned that upon the trial the default of the defendant, Ed Baxa, was taken and entered. Judgment is, therefore, entered barring both him and

the plaintiff, in his behalf, from any right of recovery under the bond.

Secondly, at the threshold of the trial, a stipulation was entered into where- under the defendant, Hartford Accident and Indemnity Company acknowledged the coverage under its bond of the following claims:

| Name of Claimant | Date when claim arose | Amount | Net Balance |
|---|---|---|---|
| a) Louis Reinke | June 10, 1952 | $347.88 | |
| | Less bankruptcy dividend November 17, 1955 | 71.54 | $ 276.34 |
| b) Melvin Schnegelberger | June 10, 1952 | $240.57 | |
| | Less bankruptcy dividend November 17, 1955 | 49.47 | $ 191.10 |
| c) Otto Kuhlmann | June 10, 1952 | $261.98 | |
| | Less bankruptcy dividend November 17, 1955 | 53.88 | $ 208.10 |
| d) Monte J. Harms | June 10, 1952 | $462.43 | |
| | Dividend | None | $462.43 |
| e) Arthur Peterson | June 10, 1952 | $564.49 | |
| | Dividend | None | $ 564.49 |
| f) Adolph Aden | May 6, 1952 | $644.72 | |
| | Less bankruptcy dividend November 17, 1955 | 132.60 | $ 512.12 |
| g) Norris Schardt | June 10, 1952 | $349.52 | |
| | Less bankruptcy dividend November 17, 1955 | 71.88 | $ 277.64 |
| h) James Bailey | June 3, 1952 | $284.49 | |
| | Less bankruptcy dividend November 17, 1955 | 58.50 | $ 225.99 |
| i) Earl Werner | June 3, 1952 | $ 43.95 | |
| | Dividend | None | $ 43.95 |
| j) Herman H. Thurnau | April 22, 1952 | $ 74.17 | |
| | Less Bankruptcy dividend November 17, 1955 | 15.25 | $ 58.92 |
| | | Total | $2,821.08 |

That stipulation, being allowed, is accepted as finally establishing the right of those ten claimant defendants to the coverage of their several claims under the bond upon which the suit is brought, and also the several amounts for which such coverage is effective. But the stipulation reserved for proof the availability to the plaintiff, or to the several other individual claimants in whose right he sues, of protection under the bond, in behalf of each of the other claimants. Upon that disputed coverage the trial proceeded. And the sufficiency of such proof is the principal subject matter of the remainder of this memorandum, which will now proceed first to the announcement of the court's findings of fact.

Deshler and Davenport are villages in Thayer County, Nebraska, which is part of an area devoted largely to farming and to the raising and feeding and marketing of livestock. In each of these villages a bank is located. The one at Deshler is Nebraska Security Bank. It will

sometimes be referred to herein as the Deshler bank.

At all times material in the case, Vernon F. Kuhlmann was a resident of Deshler. He was also known as Vern Kuhlmann and as Vern F. Kuhlmann, and his surname was occasionally spelled as "Kuhlman." By training he was an auctioneer, who had come to specialize in the auction selling of livestock. He was a mature man, and in the prime period of his life. He was and is a person of reasonable, but not extensive, education and of a fairly active business experience in the territory roughly comprising south central Nebraska and north central Kansas.

On a date not precisely established, but shown probably to have been in 1942, Vernon F. Kuhlmann entered into a partnership arrangement with a man named Waring (not to be confused with Mr. Robert B. Waring, of counsel in the present action). No written articles of partnership relating to that association are before the court; and the arrangement between Waring and Vernon F. Kuhlmann seems to have been an oral one. In pursuance of it, the partnership embarked under the name or style of "Deshler Sales Company," on a business which included the purchase and sale of livestock, and the auction sale for others on commission of livestock. The principal place of the partnership's business and the site of its livestock auctions were a sale barn at Deshler known as "Deshler Sale Barn" or "Deshler Sales Barn." That barn was erected through organized local community action at about the time of the establishment of the partnership, upon an understanding, not fully or adequately reflected in the present record, that its cost should be repaid to its builders from the proceeds of its use, and that, on such repayment, the barn should become the property of Waring, or possibly, though it does not thus clearly appear, of the members of the partnership.

The partnership so formed entered into business and continued to function until some time in 1944, when Vernon F. Kuhlmann purchased the interest in it of Waring, and succeeded to the sole ownership of its business. He then operated that business alone until some time in 1945 or 1946, when he and one Herb Brettman organized a partnership for such operation. That partnership persisted for only about a year, and was dissolved no later than some time in 1947. Upon such dissolution, Vernon F. Kuhlmann resumed the sole ownership and control of the business. And he persisted in that ownership and control continuously thereafter through all of the occurrences giving rise to the controversies now in litigation. Throughout the recited changes in its ownership, and thereafter through the month of June, 1952, the name of its business continued to be "Deshler Sales Company."

After the termination, not later than 1947, of his partnership with Brettman and continuing through the times of the occurrences giving rise to the claims in suit, Vernon F. Kuhlmann, as sole owner and proprieter, conducted a business at Deshler, with headquarters at the Deshler Sale Barn. In it, he operated under the name of, and did business as, Deshler Sales Company. That business included (a) the sale upon commission of the livestock of other persons, largely through auction sales conducted regularly in the sale ring at the Deshler Sale Barn; and (b) the purchase and sale of livestock as a business venture in itself, and for the sole use and benefit and at the risk of Vernon F. Kuhlmann. His purchases of livestock were made variously at the Deshler Sale Barn, at sales barns in other communities within traveling reach from Deshler, and on farms where the livestock happened to be. His sales of purchased livestock were made both at auctions held at Deshler Sale Barn, and at various livestock markets, especially those at Lincoln and Omaha in Nebraska. And he sometimes sold livestock so purchased by him through his sale barn at Davenport (concerning which sale barn, see later findings herein).

Osborne Livestock Commission Company, a partnership, operates and at all times material herein has operated at Osborne, Kansas, a public stockyard and market agency at a livestock sale barn in such city. That stockyard was posted under the Packers and Stockyards Act, 1921, under date of April 24, 1950, and at all times material herein was a posted public stockyard and registered market agency under the Packers and Stockyards Act, 1921. At all times material herein, Osborne Livestock Commission Company was a partnership composed of R. W. Dudley, Ransom L. Enoch and D. A. Timbers, all of Osborne, Kansas.

A stockyard operated at Salina, Kansas, under the name of Salina Sales Pavilion, as a public stockyard and market agency at a livestock sale barn in such city was posted under the Packers and Stockyards Act, 1921, under date of July 14, 1934, and at all times material herein was a posted public stockyard and registered market agency under the Packers and Stockyards Act, 1921, and actually operated as such public stockyard and registered market agency. While Salina Sales Pavilion, subsequent to its posting, had undergone some changes in ownership, it was, in May and June, 1952, a partnership composed of A. R. Wilson, Preston Simpson, and Lon Wilson, Jr., all of Salina, Kansas.

A stockyard operated at Salina, Kansas, under the name of Beverly Sales Company, as a public stockyard and market agency, at a livestock sale barn in such city, was posted under the Packers and Stockyards Act, 1921 under date of January 21, 1936, and at all times material herein was a posted public stockyard and registered market agency under the Packers and Stockyards Act, 1921, and actually operated as such public stockyard and registered market agency. While Beverly Sales Company, subsequent to its posting, had undergone some changes in ownership, it was in June 1952 a partnership composed of Jack Beverly, Maybelle Beverly, and Jack Beverly, Jr., all of Salina, Kansas.

Cloud County Livestock Commission Company, a partnership, operates, and at all times material herein has operated, at Concordia, Kansas, a public stockyard and market agency at a livestock sale barn in such city. At all times material herein, that stockyard was a posted public stockyard and registered market agency under the Packers and Stockyards Act, 1921, and was owned and operated by a partnership under the name of Cloud County Livestock Commission Company, consisting of Harold E. Liby of Glasco, Kansas, and Joe Shoots, whose place of residence is not clearly shown by the evidence. The detailed history of its posting and registration under the Packers and Stockyards Act, 1921, was not made a matter of evidence upon the trial, but such posting and registration were explicitly agreed to have occurred and are now factually found.

On August 18, 1950, after examination and measurement of the stockyard of Deshler Sales Company, as contemplated by Title 7 U.S.C.A. § 202 (see footnote[1]),

1. Copy of Title 7 U.S.C.A. § 202, follows: "202. 'Stockyard' defined; determination by Secretary as to particular yard.

"(a) When used in sections 201–203 and 205–217a of this title the term 'stockyard' means any place, establishment, or facility commonly known as stockyards, conducted or operated for compensation or profit, as a public market, consisting of pens, or other inclosures, and their appurtenances, in which live cattle, sheep, swine, horses, mules, or goats are received, held, or kept for sale or shipment in commerce. Said sections shall not apply to a stock-

yard of which the area normally available for handling livestock, exclusive of runs, alleys, or passage ways, is less than twenty thousand square feet.

"(b) The Secretary shall from time to time ascertain, after such inquiry as he deems necessary, the stockyards which come within the foregoing definition, and shall give notice thereof to the stockyard owners concerned, and give public notice thereof by posting copies of such notice in the stockyard, and in such other manner as he may determine. After the giving of such notice to the stockyard owner and to the public, the stockyard shall

public notice as required by such section was posted in its stockyard and given to Vernon F. Kuhlmann, doing business as Deshler Sales Company, as its owner. Of such notice, the following is a true copy:

"Form 1-d (Revised)
"United States Department of Agriculture
"Production and Marketing Administration
"Livestock Branch
"Washington 25, D. C.

"Date   JUL 14   1950

"Notice

"Mr. Vern F. Kuhlmann   d/b/a
"To        Deshler Sales Company        Stockyard owner.

"At     Deshler     State     Nebraska

"Notice Is Hereby Given that after inquiry, as provided by Section 302(b) of the Packers and Stockyards Act, 1921 (7 U.S. C.[A.] Sec. 202(b)), it has been ascertained by me that the stockyard known as the Deshler Sales Company at Deshler State of Nebraska is subject to the provisions of said Act.

"The attention of stockyard owners, market agencies, dealers, and other persons concerned is directed to Sections 303 and 306 (7 U.S.C.[A.] Secs. 203 and 207) and other pertinent provisions of said Act and the rules and regulations issued thereunder by the Secretary of Agriculture.

"/s/   F. W. ImMasche
"Acting Director, Livestock Branch

"The foregoing notice is a true copy of the original notice given the stockyard owners concerned.

"/s/   F. W. ImMasche

"Acting Director, Livestock Branch"

(Signatures only doubtfully legible.)

---

On August 18, 1950, therefore, on the same date on which the foregoing notice was posted and given, Deshler Sales Company, Deshler, Nebraska, Vernon F. Kuhlmann as owner, addressed to U.S. Department of Agriculture, on departmentally approved forms, two separate applications for registration under the Packers and Stockyards Act, 1921.

In one of these applications, request was made for registration, (a) as a "market agency" for "selling on commission," (b) as a "dealer" for "buying and selling," and (c) in the classification of "other service," for the performance of "stockyards service," all in respect of cattle, sheep, goats, swine, horses, and mules; the applicant was identified as an individual; and the stockyard on which the applicant would operate was designated as "Deshler Sales Company Stockyards, Deshler, Nebraska." Under this

remain subject to the provisions of sections 201–203 and 205–217a of this title until like notice is given by the Secretary that such stockyard no longer comes within the foregoing definition."

application, the applicant was registered, with certificate dated September 20, 1950, as a "market agency and dealer."

In the other of these two applications, request was made for registration only as a "dealer" to engage in "buying and selling" cattle, sheep, goats, swine, horses and mules, in the way of an operation as an individual (as distinguished from a partnership, association or corporation) at stockyards, undesignated as to their operators, located as follows: At Osborne, Salina (two in number), Superior and Hebron, and at the stockyards of "Webb Livestock Comm. Company, Grand Island," and "McCook Livestock Exchange, McCook." The first two of these cities are in Kansas. All of the others are in Nebraska. This application declared that the applicant was already registered under the Act "as market agency and dealer at Deshler, Nebraska, operating stockyards," evidently on the assumption that the then concurrent application for that registration just noted would be, and should be treated as, granted. Under the application in this paragraph described, the applicant was registered, with certificate dated September 20, 1950 only as a "dealer," at the several stockyards for which such authority had been sought in the application.

It is also noted at this point as a fact that even before the foregoing posting of the Deshler Sales Barn, and pursuant to an application dated December 8, 1948, Vernon F. Kuhlmann, doing business as Deshler Sales Company, under certificate dated February 14, 1949, was, and thereafter had continued to be, registered as a "dealer" for "buying and selling" cattle, sheep, goats, swine, horses and mules at two unidentified stockyards at each

of the cities of Benkleman, Grand Island and North Platte, and one stockyard at each of Danbury, Superior, York, and Alliance, all in Nebraska. However, the evidence indicates that this authority became inactive from and after April 5, 1950, presumably except to the extent that it was reactivated in respect of stockyards at Grand Island and Superior by virtue of the application and registration discussed in the last previous paragraph hereof.

Under authority of the Packers and Stockyards Act, 1921, (see footnote [2]) Vernon F. Kuhlmann, doing business as Deshler Sales Company, as principal, and defendant, Hartford Accident and Indemnity Company, as surety, on August 31, 1951 executed a general livestock bond, which was thereafter timely filed under the Act, in which the beneficiary was designated as "W. O. Baldwin, Trustee of Hebron, Nebraska, (or his successor in official position, if any) as Trustee for all persons who may be damaged through the breach of this bond." It is upon that bond that this suit is brought. Quotation is now made of several material portions, though not all, of such bond:

"Hartford Accident and Indemnity Company
"Hartford, Connecticut
"Executed in Duplicate
"A Stock Company
"General Live Stock Bond

"Know All Men By These Presents, that we Vernon F. Kuhlmann d/b/a Deshler Sales Company of Deshler, Nebraska, as Principal, and Hartford Accident and Indemnity Company of Hartford, Connecticut, as Surety, are held and firmly bound unto W. O. Baldwin, Trustee of

2. Copy of Title 7 U.S.C.A. § 204, follows:
  "204. Bond and suspension of registrants.
  "The secretary may require reasonable bonds from every market agency and dealer, under such rules and regulations as he may prescribe, to secure the performance of their obligations, and whenever, after due notice and hearing, the Secretary finds any registrant is insolvent or has violated any provisions of this chapter he may issue an order suspending such registrant for a reasonable specified period. Such order of suspension shall take effect within not less than five days, unless suspended or modified or set aside by the Secretary or a court of competent jurisdiction."

Hebron, Nebraska (or his successor in official position, if any) as Trustee for all persons who may be damaged through the breach of this bond, as Obligee, in the sum of ........................

............ Fifty-Two Thousand and No/100.... Dollars ($52,000.00), lawful money of the United States of America, for the payment whereof to the Obligee we bind ourselves, our heirs, executors, administrators, successors and assigns jointly and severally by these presents.

\*   \*   \*   \*   \*

"Now, Therefore, The Condition Of This Bond is such that:

Applicable if Principal *sells* on commission

(1) If the said Principal shall safely keep and faithfully and promptly account for and pay to the owners or their duly authorized agents the proceeds of sales of all live stock received for sale on a commission basis by the said Principal at a public stockyards, as defined in the Act of Congress known as the Packers and Stockyards Act, 1921, as amended;

Applicable if Principal is Dealer (Trader, Buyer, Packer, or abbattoir)

(3) If the said Principal shall pay, when due, to the person or persons entitled thereto the purchase price for all livestock purchased by said Principal at a public stockyards, as defined in the Act of Congress known as the Packers and Stockyards Act, 1921, as amended;

\*   \*   \*   \*   \*

"(b) The liability of the Surety under this bond shall not exceed Fifty-Two Thousand And No/100 Dollars ($52,-000.00), and when the Surety shall have paid that amount whether in one payment or the aggregate of several payments for, upon or by reason of one or several breaches of any condition hereof, the liability of the Surety shall immediately cease and determine.

"(c) Any person damaged by the breach of any condition hereof may maintain an action on this bond in his own name, to recover his damages, after giving written notice to the Trustee herein; or the Trustee herein may maintain an action in his own name, the recovery to be made for the use of the persons damaged, and both Principal and Surety herein hereby waive every defense, if any there might be, based upon the fact that any person damaged or in whose name the suit shall be brought is not party or privy to this bond.

\*   \*   \*   \*   \*

"(e) The term 'person' as used in this bond shall be construed to mean and include, both singular and plural, corporations, partnerships, associations, individuals, and the heirs, executors, administrators, successors, or assigns hereof.

"(f) The acts, omissions or failures of authorized agents or representatives of said Principal or persons who said Principal shall knowingly permit to represent themselves as acting for said Principal, shall be taken and construed to be the acts, omissions or failures of said Principal and to be within the protection of this bond to the same extent and in the same manner as if they were the personal acts of said Principal.

"(g) This bond may be terminated by either party hereto by delivering a written notice of termination to the other party, and to the Chief of the Packers & Stockyards Division at Washington, D. C. at least ten days prior to the effective date of such termination."

That bond remained, and was, in effect through all times material in this action. In fact, the several claims in suit all

arose during the first year after its execution.

Commencing at a date which is not precisely identified, but antedating 1952, and continuing through all the time involved in this action, Vernon F. Kuhlmann, under the name or style of "Vern F. Kuhlmann, doing business as Davenport Sales Barn," in addition to and separately from his business as Deshler Sales Company, and his operation of Deshler Sale Barn, was also engaged in business at, and operated as, Davenport Sale Barn, in Davenport, Nebraska. There he conducted regular weekly public sales of livestock, and generally conducted a livestock and sale barn business. For that business, he maintained a separate bank account in a bank at Davenport. And the business at Davenport was an entity in itself, distinct from that by him conducted as Deshler Sales Company. The Davenport Sale Barn was not posted or bonded under the Packers and Stockyards Act, 1921. It was covered, although to precisely what extent is not disclosed in this record, by a bond given under Nebraska state authority, which, though mentioned in the evidence, is not really before the court or involved in the present suit.

For all of his livestock and sale barn operations, except those at Davenport, and also for the disbursement of his living expense, Vernon F. Kuhlmann utilized the banking facilities of the Deshler Bank. Before the posting of the Deshler Sale Barn under the Packers and Stockyards Act, 1921, as the court understands the evidence, he maintained there a single bank account through which he deposited all funds received by him and made his disbursements for all purposes, business (exclusive of that conducted as Davenport Sale Barn) and personal.

After such posting and the registration, supra, of Deshler Sale Barn, ostensibly to comply with the Act and pertinent regulations, Vernon F. Kuhlmann maintained in the Deshler bank more than one checking account. One such account was identified as "Deshler Sales Company Custodial Account." Into it, Vernon F. Kuhlmann made deposits of the proceeds of the livestock of others sold by him on commission, generally at the regular livestock auctions at Deshler Sale Barn, and from it, by checks, he made disbursements on account of such sales, principally of the net sale prices to the owners of the livestock sold, but also for items of expense incident to such sales, and probably for other matters related to the business of selling on commission. In the same bank, he maintained another account under the name, "Deshler Sales Barn, General Account." [3] The evidence is not clear or convincing as to exactly what the transactions were whose proceeds and disbursements were supposed to pass through that account. These may have included purchases and sales of livestock, if any, recognized by Vernon F. Kuhlmann as being made by him as "Vernon F. Kuhlmann, doing

---

3. In this connection, the court is aware of testimony from which it may be concluded that the actual designation of this account was *Deshler Sales Company, "Shippers' Proceeds Account."* Because of the failure of the parties to present in evidence either the records of the bank or, with the exception later cited in this footnote, any checks written on or cashed from this account, the court may not and does not, with inflexible certainty, make a finding of the name in which the account was kept. It finds only that in the bank an account was maintained under a distinctive designation through which it was intended that the banking transactions in the commission business at Deshler of Vernon F. Kuhlmann, doing business as Deshler Sales Company, should be carried. Although *it is not really material to the present decision,* the court does find from the evidence that this account was known at one time as the "custodial account" and at another time as "Shippers' Proceeds Account;" but which name preceded the other, or when the change occurred may hardly be determined with certainty. However, one of the exhibits, a photostatic copy of a check drawn by Kuhlmann on the account under date of June 10, 1952 is considered to show that it was then characterized as "Shippers Proceeds Account."

business as Deshler Sales Company." But it is not shown that checks for any such purchases were drawn against, or the proceeds of any such sales were deposited in, that account. The evidence, in fact, discloses that no checks for the purchase of livestock were drawn against it. Actually, the precise use of the account and the degree of its activity, beyond the fact that it was used as a source for the payment of expenses, are left very obscure by the evidence. A third account was maintained in the bank in the personal name of Vernon F. Kuhlmann. For his use in making withdrawals from that account, he caused checks to be specially printed, whose distinguishing features were a printed cut of a steer's head at its upper left corner, and, immediately to the right thereof, and in its top center segment, the printed identification in bold letters:

"Vern Kuhlmann
"Auctioneer and Livestock Dealer
"Sales each Tuesday
"Deshler, Nebr. ——— 19—"

In point of fact, Tuesday of each week was the regular auction sale day at Deshler Sale Barn. That form of check was in common and general use at all times material in this case, and, with a single exception shortly and clearly to be noted, is the form on which the checks were written upon which the several claims now in dispute are premised. It was this third account that was principally utilized by Vernon F. Kuhlmann in his varied business operations, including, but not at all limited to, his purchases and sales of livestock, except sales on commission as agent in behalf of outside consignors.

But these Bank accounts were not operated with strict consistency or fidelity to an inflexible program or pattern. And this was especially true with the third, or so-called personal, account. With substantial frequency, checks drawn on one of the accounts were paid out of one of the others, and, from time to time, funds in one account were by the bank shifted and transferred into another of the accounts, but with this reservation, that the custodial account was not resorted to for the payment of checks drawn against, or for transfer of funds to, either of the other two accounts. Sometimes, however, checks drawn against the custodial account were paid out of one of the other two accounts; and the custodial account was occasionally enlarged by transfer of funds from one or the other of the other two accounts. The actions in this paragraph mentioned were taken with the express authorization of Vernon F. Kuhlmann.

During, and for some not exactly established interval prior to the times herein involved, one Mark Moore was employed, for the performance of general duties, by Vernon F. Kuhlmann. In that employment, he had authority to transact any of the usual business which Vernon F. Kuhlmann was operating. And this expressly included the purchase and sale of livestock, and the execution and delivery of checks against the several bank accounts, all in the name and behalf of Vernon F. Kuhlmann. He was actively engaged in that employment, and in it represented Vernon F. Kuhlmann with full authority through June, 1952.

Throughout 1952, and for some time theretofore, no one but Vernon F. Kuhlmann had any share or interest in his livestock operations, wherever or in whatever manner conducted, with the exception of his participation sporadically in temporary and isolated ventures with various local friends, generally in feeding projects, which have no practical significance in this case.

On May 28, 1952 Osborne Livestock Commission Company sold 76 head of cattle described and priced in its sales invoice under that date, copy of which is attached to its answer and cross-complaint herein, at a public auction at its stockyard in Osborne, Kansas, on a commission basis, as a market agency, under the Packers and Stockyards Act, 1921, for the respective owners thereof, to

Vernon F. Kuhlmann (under the name of Vern Kuhlmann), Deshler, Nebraska, for the purchase price of $15,430.62.

On May 28, 1952, Osborne Livestock Commission Company remitted the net proceeds of such sale of such 76 head of cattle to the respective owners thereof.

On May 28, 1952, Vernon F. Kuhlmann purchased such 76 head of cattle for his own account, and received and accepted delivery thereof, at Osborne Livestock Commission Company's stockyard; and in that behalf acted personally and not through any employee or agent.

On May 28, 1952, Vernon F. Kuhlmann made, executed, issued and delivered to Osborne Livestock Commission Company (under the name of Osborne Sale Company) check No. 4110, bearing date "5–28–1952," payable to "Osborne Sale Company," drawn on Nebraska Security Bank, Deshler, Nebraska, and signed "Vern Kuhlmann," a photostatic copy of which is attached as Exhibit A to the answer and cross-complaint herein of Osborne Livestock Commission Company. Said check was for the sum of $15,-530.62.

The check in the last paragraph described was made, executed, issued and delivered to Osborne Livestock Commission Company both in supposed and ostensible payment of the purchase price of $15,430.62 for such 76 head of cattle purchased May 28, 1952, and also in the supposed and ostensible and intended payment of an erroneous underpayment in the sum of $100 upon the purchase price of certain livestock theretofore, and on May 21, 1952, purchased by Vernon F. Kuhlmann at a public auction at the stockyard of Osborne Livestock Commission Company.

Osborne Livestock Commission Company, defendant herein, was and is the same entity as Osborne Sale Company, designated as the payee in such check.

Such check for $15,530.62 was, by Osborne Livestock Commission Company, on May 31, 1952, endorsed and deposited to its credit and in its account in Farm-ers National Bank of Osborne, Kansas. It was presented in due course for payment to Nebraska Security Bank, Deshler, Nebraska, and its payment was demanded. It was dishonored for "insufficient funds," and its payment was refused by the drawee bank. It was protested for non-payment on June 5, 1952 by one P. A. Ude, a Notary Public, and also charged back against the account of Osborne Livestock Commission Company in Farmers National Bank of Osborne, Kansas, and has never been paid. Except for the credit thereon, in consequence of the receipt by way of a dividend in bankruptcy, as hereinafter recited, the purchase price of $15,430.62 for such 76 head of cattle, and the $100 balance of the purchase price of such livestock sold on May 21, 1952, have never been paid to said Osborne Livestock Commission Company.

Subsequent to the execution and delivery of such check for $15,530.62 to Osborne Livestock Commission Company, and as of November 17, 1955, there was paid to Osborne Livestock Commission Company, as a credit upon, and against, the amount due to it upon such check and upon its claim based thereon, the sum of $3,194.45. Such payment was made as a dividend in the course of a proceeding in bankruptcy in which Vernon F. Kuhlmann was the bankrupt, then being conducted and pending in this court.

On May 31, 1952, Salina Sales Pavilion sold 41 head of cattle described and priced in its sales invoice under that date, copy of which is attached to its answer and cross-complaint herein, at a public auction at its stockyard in Salina, Kansas, on a commission basis, as a market agency, under the Packers and Stockyards Act, 1921, for the respective owners thereof to Vernon F. Kuhlmann (under the name of Vern Kuhlmann), Deshler, Nebraska, for the purchase price of $7,863.02.

On May 31, 1952, Salina Sales Pavilion remitted the net proceeds of such sale of such 41 head of cattle to the respective owners thereof.

On May 31, 1952, Vernon F. Kuhlmann purchased such 41 head of cattle for his own account, and received and accepted delivery thereof at Salina Sales Pavilion's stockyard; and in that behalf acted personally and not through any employee or agent.

On May 31, 1952, Vernon F. Kuhlmann made, executed, issued and delivered to Salina Sales Pavilion (under the name of Salina Sale Co.) check No. 4118, bearing date "5–31–1952," payable to "Salina Sale Co.," drawn on Nebraska Security Bank, Deshler, Nebraska, and signed "Vern Kuhlmann," a photostatic copy of which is attached as Exhibit A to the answer and cross-complaint herein of Salina Sales Pavilion. Said check was for the sum of $7,863.02.

The check in the last paragraph described was made, executed, issued and delivered to Salina Sales Pavilion in supposed and ostensible payment of the purchase price of $7,863.02 for such 41 head of cattle, purchased on May 31, 1952.

Such check for $7,863.02 was, by Salina Sales Pavilion, endorsed and deposited on June 2, 1952 to its credit, and in its account, in the Planters State Bank of Salina, Kansas. It was presented in due course for payment to Nebraska Security Bank, Deshler, Nebraska, and its payment was demanded. It was dishonored for "insufficient funds," and its payment was refused by the drawee bank. It was protested for non-payment on June 6, 1952 by one P. A. Ude, a Notary Public, and also charged back against the account of Salina Sales Pavilion in the Planters State Bank of Salina, Kansas, and has never been paid.

On June 7, 1952, Salina Sales Pavilion sold 38 head of cattle described and priced in its sales invoice under that date, copy of which is attached to its answer and cross-complaint herein, at a public auction at its stockyard in Salina, Kansas, on a commission basis, as a market agency, for the respective owners thereof, to Vernon F. Kuhlmann (under the name of Vern Kuhlmann), Deshler, Ne-

braska, for the purchase price of $7,673.-63.

On June 7, 1952, Salina Sales Pavilion remitted the net proceeds of such sale of such 38 head of cattle to the respective owners thereof.

On June 7, 1952, Vernon F. Kuhlmann purchased such 38 head of cattle for his own account, and received and accepted delivery thereof, at Salina Sales Pavilion's stockyard; and in that behalf acted personally and not through any employee or agent.

On June 7, 1952, Vernon F. Kuhlmann made, executed, issued and delivered to Salina Sales Pavilion (under the name of Salina Sale Co.) check No. 4044, bearing date "6–7–1952," payable to "Salina Sale Co.," drawn on Nebraska Security Bank, Deshler, Nebraska, and signed "Vern Kuhlmann," a photostatic copy of which is attached as Exhibit C to the answer and cross-complaint of Salina Sales Pavilion herein. Said check was for the sum of $7,673.63.

The check in the last paragraph described was made, executed, issued and delivered to Salina Sales Pavilion in supposed and ostensible payment of the purchase price of $7,673.63 for such 38 head of cattle.

Such check for $7,673.63 was, by Salina Sales Pavilion, on June 9, 1952 endorsed and deposited to its credit and in its account in the Planters State Bank of Salina, Kansas. It was presented, in due course, for payment to Nebraska Security Bank, Deshler, Nebraska, and its payment was demanded. It was dishonored for "insufficient funds," and its payment was refused by the drawee bank. It was charged back against the account of Salina Sales Pavilion in Planters State Bank of Salina, Kansas, and has never been paid.

Salina Sales Pavilion is the same entity as "Salina Sale Co." designated as the payee in the two several checks last hereinbefore described.

Subsequent to the execution and delivery of said two checks, one for $7,-863.02, the other for $7,673.63, to Salina

Sales Pavilion, and as of November 17, 1955, there was paid to Salina Sales Pavilion as a credit upon and against the total amount of $15,536.65 due to it upon said two checks, the sum of $3,195.70. Such payment was made as a dividend in the course of a proceeding in bankruptcy in which Vernon F. Kuhlmann was the bankrupt, then being conducted and pending in this court.

Except for the credit thereon, in consequence of the receipt by way of dividend in bankruptcy as recited and found in the last preceding paragraph, the aggregate purchase price of $15,536.65 for said two parcels of cattle so sold as aforesaid by Salina Sales Pavilion has never been paid to the said Salina Sales Pavilion.

On June 2, 1952, Beverly Livestock Sales Company sold 31 head of cattle and 84 pigs, described and priced in its sales invoices under that date, copy of which is attached to its answer and cross-complaint herein, at a public auction at its stockyard in Salina, Kansas, on a commission basis, as a market agency, under the Packers and Stockyards Act, 1921, for the respective owners thereof to Mark Moore, as agent for Vernon F. Kuhlmann, for the purchase price of $5,735.59.

On June 2, 1952, Beverly Livestock Sales Company remitted the net proceeds of such sale of such 31 head of cattle and 84 pigs to the respective owners thereof.

On June 2, 1952, the said Mark Moore, as agent for Vernon F. Kuhlmann, purchased such 31 head of cattle and 84 pigs for the account of said Vernon F. Kuhlmann, and received and accepted delivery thereof, at Beverly Livestock Sales Company's stockyard, for and in behalf of said Vernon F. Kuhlmann.

On June 2, 1952, the said Mark Moore, as agent for the said Vernon F. Kuhlmann, made, executed, issued and delivered to Beverly Livestock Sales Company an un-numbered check bearing date "6–2–1952," payable to the order of "Beverly Livestock Sales Co., Inc.,"

drawn on Nebraska Security Bank, Deshler, Nebraska, and signed "Vern Kuhlman-Mark Moore," a photostatic copy of which is attached as Exhibit A to the answer and cross-complaint herein of Beverly Livestock Sales Company. Said check was for the sum of $5,735.59, and was written upon a so-called universal check form and not upon one of the check forms which Vernon F. Kuhlmann had theretofore caused to be printed in his behalf, supra, and was then customarily using.

The check in the last paragraph described was made, executed, and delivered to Beverly Livestock Sales Company in supposed and ostensible payment of the purchase price for said 31 head of cattle and 84 pigs.

Beverly Livestock Sales Company is the same entity which is designated in the body of the check last hereinbefore described under the name of "Beverly Livestock Co., Inc." as the payee in said check.

Such check for $5,735.59 was by Beverly Livestock Sales Company, on June 3, 1952, endorsed and deposited to its credit and in its account in the Planters State Bank of Salina, Kansas. It was presented, in due course, for payment to Nebraska Security Bank, Deshler, Nebraska, and its payment was demanded. It was dishonored for "insufficient funds," and its payment was refused by the drawee bank. It was protested for non-payment on June 6, 1952, by one P. A. Ude, a Notary Public, and also charged back against the account of Beverly Livestock Sales Company in Planters State Bank of Salina, Kansas, and has never been paid.

On June 9, 1952, Beverly Livestock Sales Company sold 26 head of cattle, described and priced in its sales invoice under that date, copy of which is attached as Exhibit D to its answer and cross-complaint filed herein, at a public auction at its stockyard in Salina, Kansas, on a commission basis, as a market agency, for the respective owners thereof, to Mark Moore, as agent for Vernon F.

Kuhlmann, for the purchase price of $6,916.10.

On June 9, 1952, Beverly Livestock Sales Company remitted the net proceeds of such sale of such 26 head of cattle to the respective owners thereof.

On June 9, 1952, the said Mark Moore, as agent for Vernon F. Kuhlmann, purchased such 26 head of cattle for the account of the said Vernon F. Kuhlmann, and received and accepted delivery thereof at Beverly Livestock Sales Company's stockyard, for and in behalf of said Vernon F. Kuhlmann.

On June 9, 1952, the said Mark Moore, as agent for the said Vernon F. Kuhlmann, made, executed, issued and delivered to Beverly Livestock Sales Company, check No. 4090, bearing date "June 9, 1952," payable to the order of "Beverly Sale Co.," drawn on Nebraska Security Bank, Deshler, Nebraska, and signed "Vern Kuhlman-Mark Moore," a photostatic copy of which is attached as Exhibit C to the answer and cross-complaint herein of Beverly Livestock Sales Company. Said check was for the sum of $6,916.10.

The check in the last paragraph described was made, executed and delivered to Beverly Livestock Sales Company in supposed and ostensible payment of the purchase price for said 26 head of cattle.

Such check for $6,916.10 was by Beverly Livestock Sales Company, on June 10, 1952, endorsed and deposited to its credit and in its account in the Planters State Bank of Salina, Kansas. It was presented in due course for payment to Nebraska Security Bank, Deshler, Nebraska, and its payment demanded. It was dishonored for "insufficient funds," and its payment was refused by the drawee bank. It was protested for non-payment on June 13, 1952 by one P. A. Ude, a Notary Public, and also charged back against the account of Beverly Livestock Sales Company in Planters State Bank of Salina, Kansas, and has never been paid.

On June 9, 1952, Beverly Livestock Sales Company sold 58 head of cattle and 7 pigs, described and priced in its sales invoice under that date, copy of which is attached as Exhibit F to its answer and cross-complaint herein, at a public auction at its stockyard in Salina, Kansas, on a commission basis, as a market agency, for the respective owners thereof, to Mark Moore, as agent for Vernon F. Kuhlmann, for the purchase price of $8,818.23.

On June 9, 1952, Beverly Livestock Sales Company remitted the net proceeds for such sale of such 58 head of cattle and 7 pigs to the respective owners thereof.

On June 9, 1952, the said Mark Moore, as agent for Vernon F. Kuhlmann, purchased such 58 head of cattle and 7 pigs for the account of Vernon F. Kuhlmann, and received and accepted delivery thereof at Beverly Livestock Sales Company's stockyard, for and in behalf of said Vernon F. Kuhlmann.

On June 9, 1952, the said Mark Moore, as agent for the said Vernon F. Kuhlmann, made, executed, issued and delivered to Beverly Livestock Sales Company, check No. 4089, bearing date "June 9, 1952," payable to the order of "Beverly Sale Co.," drawn on Nebraska Security Bank, Deshler, Nebraska, and signed "Vern Kuhlman-Mark Moore," a photostatic copy of which is attached as Exhibit E to the answer and cross-complaint herein of Beverly Livestock Sales Company. Said check was for the sum of $8,818.23.

The check in the last preceding paragraph described was made, executed and delivered to Beverly Livestock Sales Company in supposed and ostensible payment of the purchase price for said 58 head of cattle and 7 pigs.

Beverly Livestock Sales Company is the same entity which is described and designated in the body of the two checks last hereinbefore described, both issued on June 9, 1952, under the name of "Beverly Sale Co.," as the payee in each of said checks.

Said check for $8,818.23 was by Beverly Livestock Sales Company, on June 10,

1952, endorsed and deposited to its credit and in its account in Planters State Bank of Salina, Kansas. It was presented in due course for payment to the Nebraska Security Bank, Deshler, Nebraska, and its payment was demanded. It was dishonored for "insufficient funds," and its payment was refused by the drawee bank. It was protested for non-payment on June 13, 1952, by one P. A. Ude, a Notary Public, and also charged back against the account of Beverly Livestock Sales Company in Planters State Bank of Salina, Kansas, and has never been paid.

Subsequent to the execution and delivery to Beverly Livestock Sales Company of the three checks last hereinbefore described, one under date of June 2, 1952, for $5,735.59, and two for $6,916.-10 and $8,818.23 respectively, both under date of June 9, 1952, and as of November 17, 1955, there was paid to Beverly Livestock Sales Company as a credit upon and against the total amount of $21,469.-92 due to it upon said three checks, the sum of $4,416.10. Such payment was made as a dividend in the course of a proceeding in bankruptcy in which Vernon F. Kuhlmann was the bankrupt, then being conducted and pending in this court.

Except for the credit thereon, in consequence and by way of the dividend in bankruptcy, as recited and found in the last preceding paragraph, the aggregate purchase price of $21,469.92 for said three parcels of livestock, so sold as aforesaid by Beverly Livestock Sales Company, has never been paid to the said Beverly Livestock Sales Company.

On May 31, 1952, Cloud County Livestock Commission Company sold five head of cattle referred to in general terms in its answer and cross-complaint herein, at a public auction, at its stockyard in Concordia, Kansas, on a commission basis, as a market agency, under the Packers and Stockyards Act, 1921, for the respective owners thereof to Mark Moore, as agent for Vernon F. Kuhlmann, for the purchase price of $656.12. (The court has been unable to reconcile that price exactly with its own summation of the prices for the individual cattle, as shown on the several scale slips therefor. But the disparity is only six cents, and is regarded as too trivial for further consideration.)

On May 31, 1952, Mark Moore, as agent for Vernon F. Kuhlmann, purchased such five head of cattle for the account of Vernon F. Kuhlmann, and received and accepted delivery thereof at Cloud County Livestock Commission Company's stockyard, for and in behalf of Vernon F. Kuhlmann.

On May 31, 1952, Mark Moore, as agent for Vernon F. Kuhlmann, made, executed, issued and delivered to Cloud County Livestock Commission Company, check No. 4084 bearing date "May 31, 1952," payable to the order of "Cloud County Sale," drawn on Nebraska Security Bank, Deshler, Nebraska, and signed "Vern Kuhlman-Mark Moore," a photostatic copy of which is attached as Exhibit A to the answer and cross-complaint herein of Cloud County Livestock Commission Company; which check was for the sum of $656.12.

The check in the last paragraph described was made, executed, issued and delivered to Cloud County Livestock Commission Company in supposed and ostensible payment of the purchase price of $656.12 for such five head of cattle so purchased on May 31, 1952 as hereinbefore found.

In such check, Cloud County Livestock Commission Company was designated as "Cloud County Sale," as the payee thereof.

Such check for $656.12 was, by Cloud County Livestock Commission Company either on May 31, 1952 or on June 2, 1952, endorsed and deposited to its credit in The Cloud County Bank, Concordia, Kansas. It was presented in due course for payment to Nebraska Security Bank, Deshler, Nebraska, and its payment was demanded. It was dishonored for "insufficient funds," and its payment was refused by the drawee bank. It was protested for non-payment on June 6, 1952

by one P. A. Ude, a Notary Public, and also charged back against the account of Cloud County Livestock Commission Company in The Cloud County Bank, Concordia, Kansas, and has never been paid, either entirely or partially.

The purchase price for such five head of cattle has never been paid, either entirely or partially.

Cloud County Livestock Commission Company did not file in its behalf any claim in bankruptcy in respect of the check immediately hereinbefore described, or the debt thereby evidenced, and has not received, through or out of the bankruptcy proceeding involving the estate of Vernon F. Kuhlmann, a bankrupt, any dividend, or distribution whatsoever.

The purchases of livestock, either by or in behalf of Vernon F. Kuhlmann, so made at the several public auctions held at the several stockyards of Osborne Livestock Commission Company, Salina Sales Pavilion, Beverly Livestock Sales Company, and Cloud County Livestock Commission Company, were not isolated purchases at such stockyards, or at any of them, by or in behalf of Vernon F. Kuhlmann. On the contrary, for several years prior to such purchases, Vernon F. Kuhlmann had frequently attended such sales and made purchases of livestock at each of such stockyards.

Anker Petersen now resides and at all times material herein resided on a farm in Thayer County, Nebraska, some five miles north of the village of Hardy, and in the general trade territory of Deshler. He has always been a farmer, and incidentally a stock raiser and feeder. He was acquainted with Vernon F. Kuhlmann, and had known him for several years. In June, 1952, his son, Lyle Petersen, whose exact age seems not to be shown, was a member of his farm household.

On June 9, 1952 Vernon F. Kuhlmann came to the farm home of Anker Petersen, and orally opened negotiations with Anker Petersen for the purchase of some fat cattle which, within the general knowledge of Vernon F. Kuhlmann, were located on the Petersens' farm. These included fifteen steers, of which, however, one belonged to Lyle Petersen, and four heifers. Apart from the steer of Lyle Petersen, all of those cattle belonged to Anker Petersen. One of Anker Petersen's steers was not, at the time of Vernon F. Kuhlmann's call, available for his inspection. It had gotten detached from the rest of the herd, and could not immediately be located; but it then was believed to be, and actually was, on the farm.

Vernon F. Kuhlmann, in that interview at the farm, made an offer in terms per hundredweight of one price for the steers, another for the heifers. But the offer for the steers was made subject to his inspection of the absent steer which could not then be made. After some negotiations, Vernon F. Kuhlmann and Anker Petersen agreed upon prices per hundredweight for the animals, subject however to (a) Kuhlmann's inspection and approval, at the tentatively agreed price, of the absent steer, (b) Anker Petersen's refusal to sell any of the animals unless he could find that steer, and unless Vernon F. Kuhlmann, on examination, would approve it and take all of the steers, including it and Lyle Petersen's steer, at the price then offered for steers, (c) the weighing of the animals at Deshler Sale Barn to determine the overall price, and (d) a somewhat indefinite arrangement that if he continued to want the animals, Vernon F. Kuhlmann would send a truck or trucks out to Anker Petersen's farm to transport them to Deshler Sale Barn, where Kuhlmann's inspection of the absent steer would be made and the sale, if finally made, would be closed. With the negotiations in that position, Vernon F. Kuhlmann left the Anker Petersen farm.

Later, during the same day, Anker Petersen located the missing steer. And at about six o'clock in the evening, through procurement by Vernon F. Kuhlmann, a truck appeared at the Petersen farm to get the cattle and take them to the Deshler Sale Barn. With Anker Pe-

tersen's help, the cattle were loaded into the truck. The trucker then transported them to Deshler Sale Barn. And Anker Petersen in an automobile followed the truck to the Sale Barn.

When the cattle in the truck, and Anker Petersen in the Petersen automobile, arrived at Deshler Sale Barn, Vernon F. Kuhlmann was already there. He first inspected the theretofore missing steer, and agreed to purchase it in the lot at the same price per hundredweight as the rest of the steers, and he and Anker Petersen then agreed finally to the sale of the cattle at the prices theretofore offered by Vernon F. Kuhlmann, and provisionally (supra) assented to by Anker Petersen. The cattle were then weighed on Deshler Sale Barn's scale. The heifers were weighed in a group separately, and the steers in small groups. Vernon F. Kuhlmann did the weighing. He made out a scale ticket identifying and briefly describing each group weighed, all of which tickets were given by him to Anker Petersen, but have evidently been misplaced or discarded and are not in evidence. But he also prepared, though not in very intelligible form, a summary of the weights and computation of the prices for the animals then purchased. That summary makes reference to the number of animals involved by the figures "5, 9, 1," which, by associated testimony, are shown with fair certainty to identify the several lots of steers as they were weighed, and to refer to a total of fifteen animals, and also by the figure and abbreviation, "4 Hfrs," meaning the four heifers then sold. Lyle Petersen's steer was separately weighed and its sale price separately figured. The computation and figures thus referred to were made on a form of statement or invoice in use at and by Deshler Sale Barn, generally it would seem, in its commission selling operations. The form, as disclosed by the instrument itself, which is in evidence, bears the following printed identifying material:

"Barn Phone 49                    Res. Phone 142

Deshler Sales Co.
Vern Kuhlmann, Owner,

Sales Every Tuesday

No.Hd. Description Buyer Price Weight Amount

Commission
Yds. & Ins.
Inspection
Total

It must be understood that, except under the heading reference, "No.Hd." the ticket thus in evidence was not filled out with fidelity to the form, and to its columnar headings and line indications, supra. It was, rather, used as stationery whereon to make and preserve the figures of the weights and prices of the animals sold, and, even that, without adequate detail or exactness. Still, with the evidence before it, the court is able to understand the significance of the ticket. Upon the computation of the sale prices, according to the weights thus determined, and the agreed prices per hundredweight, Vernon F. Kuhlmann made, executed, issued and delivered for the cattle two checks, both drawn on Nebraska Security Bank, Deshler, Nebraska, one to Lyle Petersen for $328.60, being numbered 4048, in payment for the steer belonging to Lyle Petersen, the other numbered 4047 to Anker Petersen for $5,393.93, in payment for the remaining fourteen steers and four heifers; and, thereupon, the animals were left at the Deshler

Sale Barn as delivered to Vernon F. Kuhlmann. The latter check bore a notation that it was "For 18 Str. & Hfrs." Both checks were signed by Vernon F. Kuhlmann, under the name "Vern Kuhlmann."

The foregoing check for $328.60 to Lyle Petersen was, on or prior to June 14, 1952, deposited in Farmers State Bank, Superior, Nebraska, and in due course thereafter was presented through the Omaha branch of Federal Reserve Bank to Nebraska Security Bank, Deshler, Nebraska, for payment; by which drawee bank payment was refused for "insufficient funds." On June 13, 1952, Anker Petersen endorsed and delivered the check to him for $5,393.93 to Hastings Production Credit Company (holder of a mortgage on his cattle thus sold). That check was thereupon in due course presented for payment to Nebraska Security Bank, Deshler, Nebraska, by which its payment was refused for "insufficient funds." And on June 18, 1952 such check was protested for non-payment by one P. A. Ude, a Notary Public.

Subsequent to the execution and delivery of those two checks to Lyle Petersen and Anker Petersen respectively, and as of November 17, 1955 there were paid to Lyle Petersen the sum of $67.58 and to Anker Petersen the sum of $1,109.45. Those payments were made as dividends, upon the several claims of Lyle Petersen and Anker Petersen, in the course of a proceeding in bankruptcy in which Vernon F. Kuhlmann was the bankrupt, then being conducted and pending in this court.

Except for the credit thereon, in consequence and by way of the dividends in bankruptcy, as recited and set forth in the last preceding paragraph, the checks so made, executed, issued and delivered to Lyle Petersen and Anker Petersen respectively, and the purchase prices for the steer belonging to Lyle Petersen and for the steers and heifers belonging to Anker Petersen have never been paid.

Lauritz M. Andersen is also and sometimes known as L. M. Andersen. In 1952, he resided near Ruskin, Nebraska, and between eleven and fifteen miles distant from Deshler, Nebraska, and was engaged in business as a farmer and livestock feeder. Because of its relevance to facts hereinafter found, it is now found as a fact that he then was and still is a practicing member of a religious society by one of whose tenets the transaction of commercial business on Sunday is either forbidden or firmly discouraged. In 1952, June 8 was a Sunday. Andersen had then been acquainted with Vernon F. Kuhlmann for about ten years, and had theretofore done business with Vernon F. Kuhlmann at Deshler Sale Barn, in the course of which Andersen had both sold and bought livestock at such barn.

On Thursday, June 5, 1952, Lauritz M. Andersen went to the home of Vernon F. Kuhlmann in Deshler, and asked Vernon F. Kuhlmann whether he desired to make any further purchases of cattle during that week. Kuhlmann replied that he did not know but if he concluded to do so he would call on Mr. Andersen. Later, and during the afternoon of that day, Kuhlmann appeared at the Andersen farm, looked at Mr. Andersen's cattle and talked with him. Kuhlmann then made an offer to buy at $31.50 per hundredweight all of a herd of such steers, except one for which he then made no offer, but which he wholly excluded from his offer. No agreement whatever was then reached between the parties.

Then, on Sunday, June 8, 1952, Vernon F. Kuhlman returned unannounced to the Andersen farm and had a further conversation with Lauritz M. Andersen about the cattle. At that time, he raised his offer for the cattle to $31.75 per hundredweight, but with the one steer excluded on which he still made no offer. Lauritz M. Andersen then refused to do any business, or further to discuss the sale of the cattle, on Sunday. But he told Kuhlmann that if he desired to purchase all of the cattle in the herd, he should send a truck out for them on the next day.

In the forenoon of Monday, June 9, 1952, at the procurement of Vernon F. Kuhlmann, two trucks appeared at the Andersen farm. The operators of the trucks and Mr. Andersen loaded twenty-nine steers into the trucks. These included the one steer on which Kuhlmann had made no offer, and which he had excluded from his earlier offers. The operators of the trucks then took the steers into Deshler and to the Deshler Sale Barn. Lauritz M. Andersen followed immediately behind the trucks in his automobile, and arrived at the barn with the steers. Vernon F. Kuhlmann was at the barn.

Vernon F. Kuhlmann then offered $30 per hundredweight for the previously excluded steer after inspecting that steer, and stood firm in his offer of $31.75 per hundredweight for the other twenty-eight steers, but all subject to a deduction of two percent as a shrinkage charge. Lauritz M. Andersen accepted the offer.

Thereupon, Vernon F. Kuhlmann weighed the steers upon the scale at the sale barn. The steer whose agreed price was $30 per hundredweight was weighed alone. The other twenty-eight steers were weighed in four groups, each comprising seven steers. Mr. Kuhlmann made out scale weight records, one for each of those weighing operations, each showing the number and classification of the animals weighed in the operation, the total weight and the agreed price per hundredweight, and the designation of "L. M. Anderson" (sic) as the owner. And a copy or duplicate of each such record was given to Lauritz M. Andersen. Vernon F. Kuhlmann then prepared—on a form identical with that used, supra, in the purchase on the same day from the Petersens, supra—a sale statement, showing again, but on a single sheet, the data he had already entered on the scale weight records, containing an addition of the weights, and a computation of the amount due on the basis of the weights and prices, namely $9,990.58. This sale statement was also given to Lauritz M. Andersen.

Vernon F. Kuhlmann then made, executed, issued and delivered to Lauritz M. Andersen for the steers so sold a check, numbered 4045, drawn on Nebraska Security Bank, Deshler, Nebraska, for $9,990.58. In the check, the payee was designated as "L. M. Anderson" and the maker's name was signed as "Vern Kuhlmann." In the body of the check was a notation to the effect that it was "For 29 strs 32140 less 2%." The gross weight of the steers as weighed was 32,140 pounds. That check was executed and delivered at Deshler Sale Barn by Vernon F. Kuhlmann to Lauritz M. Andersen as the supposed and ostensible payment for the twenty-nine steers, and the steers were there and thereupon surrendered and delivered to Vernon F. Kuhlmann.

On June 9, 1952, Lauritz M. Andersen deposited the check last described to his credit. Such check was timely presented through the Omaha Branch of Federal Reserve Bank to Nebraska Security Bank, Deshler, Nebraska for payment, by which drawee bank payment was refused for "insufficient funds," and on June 12, 1952, such check was protested for non-payment by one P. A. Ude, a Notary Public.

Subsequent to the execution and delivery of the check to Lauritz M. Andersen herein described, and as of November 17, 1955 there was paid to Lauritz M. Andersen the sum of $2,054.90, as a dividend upon the claim of Lauritz M. Andersen, in the course of a proceeding in bankruptcy in which Vernon M. Kuhlmann was the bankrupt, then being conducted and pending in this court.

Except for the credit thereon, in consequence and by way of the dividend in bankruptcy as recited and set forth in the last preceding paragraph, the check so made, executed, issued and delivered to Lauritz M. Andersen and the purchase price for the twenty-nine steers belonging to Lauritz M. Andersen have never been paid.

So far as the evidence and pleadings before this court disclose, the several de-

fendants, Osborne Livestock Commission Company, Salina Sales Pavilion, Beverly Sales Company, and Cloud County Livestock Commission Company, in their respective records incident to their sales of livestock above described and acceptance of checks therefor, identified, as the purchaser on each occasion, Vernon F. Kuhlmann (sometimes under the name of Vern Kuhlmann or Vern Kuhlman), without any precise definition of the character or capacity in which he purchased, thus without specific addition to his name of the words "doing business as Deshler Sales Company," or any substantial equivalent of them. But all of those sellers, at the times of their respective sales, were and for some time theretofore had been, aware of his engagement as a buying and selling dealer in the livestock business as Deshler Sales Company, with headquarters at Deshler, as reflected in the foregoing findings, as well as his market agency operations under the same name and with the same central location. Besides, as also appears, supra, he was, and for some time theretofore had been registered under the Packers and Stockyards Act, 1921, supra, at the stockyards of each of the first three of those sellers, as a buying and selling "dealer" (see definitions of Act in footnote [4]) under the name of "Vernon F. Kuhlmann, doing business as Deshler Sales Company." So far as appears from the present record, he was not registered under the Act as a dealer or otherwise at any of those four stockyards under any other name or style,

particularly under the name of Vernon F. Kuhlmann individually without reference to his "doing business as Deshler Sales Company." The court considers that the evidence is silent upon the question whether, under any name or in any capacity, he was registered under the Act as a "dealer" at the stockyards of Cloud County Livestock Commission Company, and it, therefore, proceeds to its decision upon the allowable assumption that he was not so registered at that yard.

No adequate, convincing, or really instructive books of account, kept or maintained by Vernon F. Kuhlmann, are shown in evidence, by which the court may be aided in its consideration of the issue principally before it. It does not persuasively appear whether he kept and maintained a really complete set of books. And nearly all of such records as he kept were shown upon the trial to have been misplaced and beyond the possibility of presentation to the court. After much inquiry and towards the end of the trial, Vernon F. Kuhlmann presented, as exhibit 26, a buckram bound stationery stock volume, seven inches by twelve inches in size, containing 172 numbered pages, inclusive of index sheets, ostensibly a book for the keeping of ledger accounts. As a witness, Vernon F. Kuhlmann identified it as a book in which he kept a record of his own private business. On only eleven of its pages is there any writing. And with the exception of some presently unrelated memoranda on its last page, under the

---

4. Definitions prescribed under the Act, as shown in Title 7 U.S.C.A. § 201, include these:

"201. 'Stockyard owner'; 'stockyard services'; 'market agency'; 'dealer'; defined

"When used in this chapter—

"(a) The term 'stockyard owner' means any person engaged in the business of conducting or operating a stockyard;

"(b) The term 'stockyard services' means services or facilities furnished at a stockyard in connection with the receiving, buying, or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling in commerce, of livestock;

"(c) The term 'market agency' means any person engaged in the business of (1) buying or selling in commerce livestock at a stockyard on a commission basis or (2) furnishing stockyard services; and

"(d) The term 'dealer' means any person, not a market agency, engaged in the business of buying or selling in commerce livestock at a stockyard, either on his own account or as the employee or agent of the vendor or purchaser."

penciled heading "Jansen acct," the sheets contain no language identifying the significance of the words and figures that appear on them. On page 16, there are some undated and unidentified figures that are not shown to have any present significance. From pages 17 to 25, both inclusive, there are some dated entries, of which some, in the light of other evidence herein, may be identified as referring with reasonable certainty to some, but not all, of the sales and checks *in controversy.*

Those entries reasonably identifiable will now be noted briefly.

(a) On page 23 appear the following entries on two successive lines:

"5–28  39 Osborne  24580x  6863.05
5–28  35   "   26165x  7877.57"

It is manifest that the foregoing figure "35" is an overwritten replacement of the figure "37." It may be concluded that the entries, taken together, are intended to reflect the foregoing transaction of May 28, 1952,. with Osborne Livestock Commission Company, though not with exact accuracy. "5–28" on each of the lines probably refers to the date. The figures "39" and "35" immediately after them probably refer to the numbers of animals sold in separate lots. But, together, they aggregate only seventy-four; whereas seventy-six animals were then sold. Moreover, the sum of the indicated prices is substantially less than the gross Osborne sale. One is, therefore, compelled to suppose that two cattle then sold are not accounted for in the entries and their absence may account for the shortage in the gross sale price.

(b) Also on page 23 appears this entry:

"5–31  41  Salina  26645x  7863.02"

and on page 24 appears only one entry and that is:

"6–6  38  Salina  27875  7673.63"

Those two entries may fairly be considered to reflect the two Salina Sales Pavilion transactions, though with a single day's disparity in the date of the later one.

(c) Again, on page 23 is this entry:

"6–9  26  Salina  22310x  6916.10"

This may well be an entry identifying the first Beverly Livestock Sales Company transaction of June 9, 1952, supra, for it is to be remembered that that company operates at Salina.

(d) On page 25, this entry is found:

"6–9  19  A. Petersen  $5722.53"

It is probably sufficient to reflect in a single consolidated entry the sales of the Anker Petersen and Lyle Petersen animals, treated as one acquisition.

(e) Finally, and also on page 25, is the following notation:

"6–9  29 L. M. Anderson  $9990.58"

Which, with due allowance for the disparity in spelling the surname, may be considered to represent the Lauritz M. Andersen sale and check.

The court has been unable to locate in the exhibit, even after repeated examination, any notations reflective either of the Beverly Livestock Sales Company sales and checks for $5,735.59 and $8,-818.23, or of the Cloud County Livestock Commission Company sale and check for $656.12.

And even in respect of the entries just identified and quoted, which may reasonably be understood as reflective, though with some disparities, of others of the transactions, the notations in the book, exhibit 26, are almost completely indecisive upon the prime question before the court.

Upon the whole record, and in full recognition of its inclusion of evidence to the contrary, the court finds that in making each of the several purchases, and in the making, execution, issuance and delivery of the several checks hereinbefore specifically discussed, Vernon F. Kuhlmann acted as "Vernon F. Kuhlmann, *doing business as Deshler Sales Company,*" that is to say, in the capacity

in which he and defendant, Hartford Accident and Indemnity Company executed, filed and gave the bond in suit. This declaration is made as a finding of fact; and it is actually a factual declaration. But, because, instead of being a simple fact, it is the answer to a somewhat complex question involving in a measure both conclusions of fact from primary facts and legal considerations, the subject has been, and is being, reserved for brief discussion in a later portion of this announcement.

Reserving for later hearing and ruling the issues and proofs on the claim of, and in behalf of, defendant Floyd E. Boyer, supra et infra, the following several claims for the following several sums of money have been established by the evidence already before the court to be based upon, and to arise out of, damages by the several claimant defendants respectively sustained through the breach, by Vernon F. Kuhlmann, doing business as Deshler Sales Company, of the bond in suit.

| Name of Claimant | Total Claim | Credit by dividend in bankruptcy | Net Balance unpaid |
|---|---|---|---|
| Osborne Sales Company | $15,530.62 | $3,194.45 | $12,336.17 |
| Salina Sales Pavilion | $15,536.65 | $3,195.70 | $12,340.95 |
| Beverly Sales Company | $21,469.92 | $4,416.10 | $17,053.82 |
| Cloud County Livestock Commission Company | $ 656.12 | none | $ 656.12 |
| Lyle Petersen | $ 328.60 | $ 67.58 | $ 261.02 |
| Anker Petersen | $ 5,393.93 | $1,109.45 | $ 4,284.48 |
| Lauritz W. Andersen | $ 9,990.58 | $2,054.90 | $ 7,935.68 |
| Louis Reinke | $ 347.88 | $ 71.54 | $ 276.34 |
| Melvin Schnegelberger | $ 240.57 | $ 49.47 | $ 191.10 |
| Otto Kuhlmann | $ 261.98 | $ 53.88 | $ 208.10 |
| Monte J. Harms | $ 462.43 | None | $ 462.43 |
| Arthur Peterson | $ 564.49 | None | $ 564.49 |
| Adolph Aden | $ 644.72 | $ 132.60 | $ 512.12 |
| Norris Schardt | $ 349.52 | $ 71.88 | $ 277.64 |
| James Bailey | $ 284.49 | $ 58.50 | $ 225.99 |
| Earl Werner | $ 43.95 | None | $ 43.95 |
| Herman H. Thurnau | $ 74.17 | $ 15.25 | $ 58.92 |
| | | Total unpaid | $57,689.32 |

———◆———

Of these claims, only the following several claimants:

| Name of claimant | Amount of claim |
|---|---|
| Cloud County Livestock Commission Company | $656.12 |
| Monte J. Harms | $462.43 |
| Arthur Peterson | $564.49 |
| Earl Werner | $ 43.95 |
| Total of such claims | $1,726.99 |

failed to file claims in the Vernon F. Kuhlmann bankruptcy proceeding, and, therefore, failed to receive from such bankruptcy estate any dividend by way of application or credit upon their respective claims. If their claims were wholly disregarded in this action, claims would therefore remain unpaid in the aggregate sum of $55,962.33, thus large-

ly in excess of the penal sum of the bond sued upon.

Upon the basis of the facts thus found, the court proceeds with clearly indicated brevity to the announcement, first, of the conclusions which necessarily follow from them, and, secondly, to the indication of certain areas of controversy which are either not yet tried out to the court or not submitted with the measure of thoroughness desirable for final ruling.

It is preliminarily noted that defendant, Hartford Accident and Indemnity Company, on the eve of the trial which was had herein, served and filed a motion (filing 146) to bring in as third-party defendants, Nebraska Security Bank and Jennings State Bank. The relationship of Nebraska Security Bank to the operations of Vernon F. Kuhlmann has already been adverted to in this ruling. Of Jennings State Bank, it need now be said only that it was the bank through which, principally if not entirely, Vernon F. Kuhlmann channeled the financial transactions incident to his operation of Davenport Sale Barn at Davenport, where Jennings State Bank is located. The motion (filing 146) is substantially a renewal of a request to like effect made in a motion (filing 58) filed much earlier in the action. That request was promptly submitted and, by the court, denied (see memorandum, filing 85, and order, filing 86). The court understands, of course, that, in its present submission, it rests, in addition to its earlier basis, upon the developments in the action subsequent to that earlier ruling, and that these include, among other things, a limited concession of liability under the bond. Even so, the pending motion is considered not to be well taken, and is being denied. And the ground of such action is essentially the same as that which prompted the former denial.

Directly oriented to the final submission of the issues thus for trial herein, and served and filed several weeks after the trial, are a motion (filing 148) by defendants Beverly Livestock Sales Company, Salina Sales Pavilion and Osborne Livestock Commission Company for findings of fact and conclusions of law in accordance with written proposals by the moving parties, and objection thereto (filing 149) by defendant, Hartford Accident and Indemnity Company, along with which the objecting party conditionally requests the making of certain findings of fact and conclusions of law. These conflicting positions have had the court's respectful consideration in the light of the evidence and the record, and of arguments of counsel tendering them. And the factual findings of the court already announced, and the conclusions shortly to be advanced are believed fairly and adequately to reflect the answer of the court upon those positions. By way of a formal ruling on the motion and objection, however, an order is being made and given, granting and sustaining the claimant defendants' motion to the extent that its requested findings and conclusions are herein announced and otherwise denying and overruling it, and making comparable disposition of the request for findings and conclusions by defendant, Hartford Accident and Indemnity Company, and overruling or granting and sustaining, as the case may be, its objection in harmony with the announcements of this opinion. Without limitation, it is suggested in passing that the point upon which the court chiefly disagrees with the claimant defendants' requested position is their insistence that the phrase "d/b/a Deshler Sales Company" in the bond is to be regarded merely as *descriptio personae*, and thus not a limitation of its coverage of the operations of Vernon F. Kuhlmann. But, directly related to that contention, the court is also persuaded that the transactions here under scrutiny were had by Vernon F. Kuhlmann, doing business as Deshler Sales Company, and, therefore, within the bond's reach. Those associated questions will now be discussed very briefly.

In its study of the coverage of the bond, the court has been quite aware of the familiar *"descriptio personae*

rule"; and in a proper setting the court would have no disinclination or reluctance to apply it. But the facts surrounding Vernon F. Kuhlmann's operations as disclosed by the evidence seem clearly to forbid its application to the extent for which the claimant defendants, or some of them, contend. The defendant, Vernon F. Kuhlmann, operated in various phases of the livestock business and in different ways. He conducted a public sale barn with regular weekly auction sales at Davenport. That barn and the stockyard incident to it were not posted or otherwise administered under the Packers and Stockyards Act, 1921. A separate bond, not in evidence or involved here, was in force for coverage of Vernon F. Kuhlmann's business under the style "Vernon F. Kuhlmann, doing business as Davenport Sales Barn," under the law of Nebraska, supra. It is inescapably certain—and is not questioned—that, although his Davenport business was a venture solely owned and operated by Vernon F. Kuhlmann as an individual, it was not within the coverage of the bond here sued upon. What that bond was patently designed to cover was, in its totality, that segment of the principal's business operations, which he conducted as "Vernon F. Kuhlmann, doing business as Deshler Sales Company." And, as has already been made clear, that segment included both his activity as a market agency centered at Deshler Sale Barn, and his venture as a "dealer" including the buying and selling of livestock, not only at Deshler Sale Barn but also elsewhere, supra. Those features of his operations the bond was designed to, and by its terms did, cover. See quotations from bond, supra. Accordingly, the court is convinced that the bond did not cover every purchase or sale of livestock which Vernon F. Kuhlmann might have made, but covered only those in which he engaged, wherein he was in *reality* "doing business as Deshler Sales Company." It was not, however, limited to his dealings as an auction seller or other seller of animals at Deshler Sale Barn or to purchases by him made at that barn.

■ But the court, further, pertinently concludes and finds that each of the several purchases here in dispute, so far as they have been identified and examined, was made by him as "Vernon F. Kuhlmann doing business as Deshler Sales Company." This conclusion and the finding to which it leads warrant some discussion. And the several purchases, differently circumstanced, deserve separate consideration.

■ There is a real identity in setting among the sales made severally by Osborne Livestock Commission Company, Salina Sales Pavilion, and Beverly Sales Company. Each seller operated a stockyard and sale barn, which was posted under the Packers and Stockyards Act, 1921, as a market agency. And each sale by it made was made at such stockyard and sale barn at a regular auction sale. "Vernon F. Kuhlmann, doing business as Deshler Sales Company" was a registered dealer under the Packers and Stockyards Act, 1921 at each such stockyard, and authorized, thereby and in that capacity, to act as a buyer of livestock at each such stockyard. He was not otherwise registered at any of those stockyards. Particularly, he was not so registered simply as "Vernon F. Kuhlmann" or as "Vern Kuhlmann" as he was familiarly known. Significance is to be attributed to the requirement of the statute for such registration and its prescription of a substantial penalty for operation as a dealer at a posted stockyard without such registration, Title 7 U.S.C.A. § 203.[5] Kelley v. United States,

---

5. Title 7 U.S.C.A. § 203, provides:

"203. Registration of stockyard dealer or market agency; penalty for failure to register

"After the expiration of thirty days after the Secretary has given public notice that any stockyard is within the definition of section 202 of this title by posting copies of such notice in the stockyard, no person shall carry on the business of a market agency or dealer at such stockyard unless he has registered with the Secretary under such rules and regulations as the Secretary

10 Cir., 202 F.2d 838, affirming United States v. Kelly, D.C.Okl., 106 F.Supp. 394; Woerth v. United States, 8 Cir., 231 F.2d 822, affirming United States v. Woerth, D.C.Iowa, 130 F.Supp. 930. A situation is thus presented in which Vernon F. Kuhlmann, doing business as Deshler Sales Company, was lawfully authorized to buy livestock as a dealer at each such barn, but was not so authorized in any other capacity. In that situation, it is presumed that in his purchases he operated in the capacity in which he was authorized to act and not in a manner forbidden and penalized by the law. Hobbs v. McLean, 117 U.S. 567, 6 S.Ct. 870, 29 L.Ed. 940; Kipp v. Goffe & Carkener, 144 Kan. 95, 58 P.2d 102, 108 A.L.R. 918. So, Kuhlmann will be presumed to have bought the cattle "doing business as Deshler Sales Company." Thus registered, too, he was and had been a regular buying customer at each of the three stockyards in question; and their operators had a right to consider him to be operating as a buyer under his registration. Finally, he paid for all of the animals except those purchased for $5,735.59 on June 2, 1952 with checks which, though signed in his personal name, were written on a printed check blank form prepared by him (see distinguishing features, supra) which identified him as an "auctioneer and *livestock dealer*" (emphasis added) and, by reference to Deshler, Nebraska and the phrase "sales each Tuesday" identified him with the Deshler Sale Barn, whose sale date was thus emphasized. The Court is left in no doubt that the buyer in each instance was "Vernon F. Kuhlmann doing business as Deshler Sales Company."

The single, and comparatively small, sale of Cloud County Livestock Commission Company differs in only one respect from those of the other Kansas stockyards sales. That respect, admittedly of consequence, is the absence, so far as the evidence discloses, of any registration whatever or in any capacity by Vernon F. Kuhlmann as a buyer at the seller's stockyard. Otherwise, its circumstances were the same as those that occurred at Osborne and Salina. And while the court has accorded weight to that circumstance, it has not been regarded as requiring a different conclusion from that arrived at in respect of those other sales at Kansas yards.

The sales by the two Petersens, father and son, and Andersen obviously differ in their surroundings from those occurring at the Kansas stockyards. The elder Petersen and Andersen were farmers and stock feeders within the trade territory of Deshler stockyards. Each had dealt in his selling of livestock with Vernon F. Kuhlmann, and was familiar with his operation as Deshler Sales Company, and with his centralization of his business at Deshler Sale Barn. Of them, one first approached Kuhlmann with a view to selling him some cattle, the other was initially approached by Kuhlmann. In each instance, there were preliminary negotiations at the seller's farm with an offer by Vernon F. Kuhlmann on a hundredweight price basis, which required weighing at Deshler Sale Barn to determine the sale price in terms of money. But each such offer on the farm was made on condition declared by Kuhlmann that one of the seller's animals be eliminated from the sale. In neither instance was an agreement reached at the farm, nor was an offer there made which was then or thereafter accepted. In fact, Andersen, from religious scruples, refused at the final meeting on the farm to do any business because the day was Sunday. Each seller, in a truck or trucks provided by Kuhlmann, sent and personally accompanied, all his cattle (including the one in each instance for which no offer had been made) to Deshler Sale Barn, where Vernon F. Kuhlmann

---

may prescribe, his name and address, the character of business in which he is engaged, and the kinds of stockyard services, if any, which he furnishes at such stockyard. Whoever violates the provisions of this section shall be liable to a penalty of not more than $500 for each such offense and not more than $25 for each day it continues, which shall accrue to the United States and may be recovered in a civil action brought by the United States."

was present. Then and there, Vernon F. Kuhlmann made final inspection and a final offer, and the offer was accepted, the cattle weighed, the sale price figured, and paid by check or checks on the form already discussed, and delivery made of the animals. That was when and where each of those sales was made. And the site of each sale was a posted stockyard for which Vernon F. Kuhlmann, doing business as Deshler Sales Company, was registered as a dealer under the Packers and Stockyards Act, 1921. The court is satisfied and concludes that those sales also were made to Vernon F. Kuhlmann, doing business as Deshler Sales Company. In arriving at that conclusion it attributes no substantial weight to the fact that each of the sales occurred on Monday rather than on Tuesday, the Deshler Sale Barn's regular auction day, and was a negotiated, rather than an auction, sale. The stockyard's functions were not limited to auctions or its business confined to a single day in a week. Nor were the operations of Vernon F. Kuhlmann, doing business as Deshler Sales Company, thus circumscribed.

■■ The conclusion necessarily follows that each of the disputed sales was within the protection and coverage of the bond sued upon. That, coverage granted, the ostensible payment for each lot of livestock sold with an insufficient fund check upon which later, and in due course, payment was refused by the drawee bank, constituted a breach of the bond is manifest and is not seriously disputed. The damage for the breach sustained by each check holder is the amount of such check, diminished, of course, to the extent of the credit, if any, upon it on account of the holder's receipt of a dividend in bankruptcy. And the total amount of such damages, even disregarding any award that may hereafter be made on account of the claim of defendant, Floyd E. Boyer, substantially exceeds $52,000, the penal sum of the bond. So far as the court is presently able to perceive, no determination in favor of Floyd E. Boyer upon his claim, which may hereafter be made, may operate to enlarge the liability to the plaintiff herein of defendant, Hartford Accident and Indemnity Company. Such a determination would seem to affect, rather, the proportions in which the beneficiaries of the trust shall share in the recovery on the bond.

It follows that plaintiff is entitled to judgment against defendant, Hartford Accident and Indemnity Company for $52,000 and the costs of this action. Whether, as against defendant, Hartford Accident and Indemnity Company, plaintiff, as he prays and argues, is entitled, further, to interest on the amount last indicated and for what period of time, if at all, and to the taxation of an attorneys' fee seems not yet to have been presented adequately to the court. Plaintiff has, indeed, discussed these questions to some extent. But it is considered that others of the parties may properly desire more pointedly to present their views upon them, and that an opportunity for such presentation should be provided before the giving of final directions for the preparation and entry of judgment.

Accordingly, an order is being made and given directing that the action be continued for oral argument upon those two points, to be held *at Lincoln immediately upon the conclusion of the hearing now set to commence on March 10, 1958 at 9:30 A.M.*, in case No. B–15–52, In the matter of American Buslines, Inc.

Jurisdiction is also retained over this action for the trial and determination of the issues arising upon the claim of defendant, Floyd E. Boyer. Unless counsel stipulate to the contrary, that trial will be had before a jury and pursuant to an appropriate setting on the Lincoln Calendar.

In its consideration of the amount of plaintiff's recovery, the court has been mindful of a contention, advanced by defendant, Hartford Accident and Indemnity Company, that each claim whose claimant failed to file a claim in bankruptcy in the proceeding involving Vernon F. Kuhlmann, should, in consequence of such failure, be denied any protection under or recovery upon its bond. The

court has not felt called upon to decide that question. It seems to be quite academic. As has already been declared, the total amount of those claims which were not presented in bankruptcy is so small that, even if they were entirely excluded from protection by the bond, claims admittedly presented in bankruptcy remain, whose total sum after credits for bankruptcy dividends, substantially exceeds the penal sum of the bond. If the point were urged by one or more of the claimants, rather than by the surety on the bond, it would have to be met and determined. But, as the court understands, that is not the situation.

This memorandum will be considered to set out the facts of the case, and the court's legal conclusions upon it. And it will be unnecessary to make further and separate factual findings and conclusions of law.

At an appropriate time, and undoubtedly immediately after, the oral argument respecting interest and attorneys' fees herein foreshadowed, direction will be given for the entry of judgment—and for the formal preparation of written judgment.

The clerk will transmit forthwith by United States mail copies of this memorandum to counsel in the case.

### Supplemental Opinion

On March 1, 1958, the court prepared and filed in this action a memorandum opinion announcing and discussing the ruling on the merits of the case, so far as it then appeared finally to have been submitted. Reference is now made, without unnecessary repetition, to that opinion, by way of recollection of its contents. It left undetermined certain issues which, as the court was persuaded, were then either wholly unpresented, or not adequately exposed for decision. These included (a) the merits of the claim made by defendant, Floyd E. Boyer, in his pleadings, (b) the demand of plaintiff for interest, from the alleged—and determined—default under the bond, on the amount of the bond, and (c)

plaintiff's prayer for the award of an attorneys' fee. Since the filing of such earlier opinion, those three matters have been submitted, and decision is now announced upon them. As briefly as seems appropriate, they will be dealt with in that sequence.

By stipulation of the parties the Boyer claim, upon which initially a trial by jury was requested, was submitted to the court without a jury. Evidence was received upon it, which has had careful consideration. The facts pertinent to it are first noted, with this understanding, that the findings of the former opinion touching the history and manner of the operations in the livestock business and marketing operations, of defendant, Vernon F. Kuhlmann, and the status of the bond in suit, are again being taken into consideration, though without present repetition.

Floyd E. Boyer is, and at all material times was, a resident of Deshler, a farmer and livestock feeder, a man of substantial means, and a fairly extensive operator in the cattle feeding enterprise. He is several years older than Vernon F. Kuhlmann, with whom he has been acquainted since the latter's birth. In the spring of 1952, Floyd E. Boyer had on one of his farms near Deshler ninety-one head of steers that were fat and ready for market. Vernon F. Kuhlmann knew of the availability for purchase of those steers; and he and Floyd E. Boyer had discussed them. But Vernon F. Kuhlmann had signified to Floyd E. Boyer his tentative lack of desire to buy them rooted in an impression that they were not as fat as he would desire. Floyd E. Boyer, therefore, intended to separate the ninety-one animals into two distinct groups, and to ship them to market some distance from Deshler, one group to each of two different cattle buyers. With that in view, he had asked and obtained from Vernon F. Kuhlmann permission to use the facilities of Deshler Sales barn for the "sorting" and weighing of the cattle. This permission had been sought and obtained in a conference between Messrs.

Boyer and Kuhlmann in the morning of June 2, 1952, at the place of business of Deshler Sale barn.

In the afternoon of June 2, 1952, Floyd E. Boyer, with the assistance of men and motor trucks which he had procured, took his ninety-one cattle to Deshler Sale barn intending, at that place, only to weigh them and separate them into the two groups for shipping and sale elsewhere. On his arrival, Vernon F. Kuhlmann was already at the sale barn. In the presence and with the cooperation of Vernon F. Kuhlmann, Floyd E. Boyer made the separation into groups of the cattle and weighed them. In those operations, both of those men observed and understood the animals and their weights.

That service completed, Vernon F. Kuhlmann orally signified to Floyd E. Boyer his readiness and willingness to buy the cattle and pay for them at the price of $32.50 per cwt., which theretofore Floyd E. Boyer had told Vernon F. Kuhlmann he would accept, but Vernon F. Kuhlmann had expressed his preliminary unwillingness to pay. In other words, Vernon F. Kuhlmann underwent a change of attitude towards his purchase of the cattle upon his more careful examination of their condition and observation of their weight.

Thereupon, agreement was made between the two men for the sale of the cattle to Kuhlmann at the price per hundredweight above indicated. And the sale thus resolved upon was immediately consummated at Deshler Sale barn. In the course of such consummation, Vernon F. Kuhlmann, on a Deshler Sales Company form of sale memorandum, made out and delivered to Floyd E. Boyer, a memorandum of sale, showing the weights of the ninety-one head of cattle in eight weighing groups aggregating 106,230 pounds, the price, $32.50, and the gross sale price amounting to $34,-524.75. At the same time, on a check form identical with that described on page 14 of the memorandum of March 1, 1958, Vernon F. Kuhlmann (under the name of Vern Kuhlmann) executed and delivered a check, numbered 4122, on Nebraska Security Bank for $34,524.75, payable to the order of F. E. Boyer. And Floyd E. Boyer, by way of delivery of the cattle, simply left them at Deshler Sale barn. The transaction in this paragraph mentioned occurred on Monday. And the regular weekly auction sale day at Deshler Sale barn was held on Tuesday of each week.

Floyd E. Boyer did not present the foregoing check to the drawee bank for payment on the day it was drawn. From the evidence, it is found that he presented it for payment a short time—and probably two days—later. When so presented, the check was dishonored and payment refused for want of sufficient funds wherewith to pay it. Thereupon, and on a Wednesday, and probably the second day after the delivery of the check, Floyd E. Boyer orally and personally informed Vernon F. Kuhlmann of the rejection of the check. On the immediately preceding day at a regular Tuesday sale of Deshler Sale barn by Deshler Sales Company, Floyd E. Boyer had bought some cattle for the price of $2,025.04, for which he had not yet made payment, although he had taken delivery of the cattle. That had clearly been a Deshler Sales Company transaction. When he was confronted on Wednesday with the dishonored check, Vernon F. Kuhlmann advised Floyd E. Boyer that he would, and then did, waive the right to collect the foregoing sum of $2,025.04 in consideration of a credit in that sum on the debt represented by the large check of June 2, 1952; to which Floyd E. Boyer agreed. And Vernon F. Kuhlmann agreed promptly to pay the balance due, on the unpaid check. A week later, the check being still largely unpaid, Vernon F. Kuhlmann paid to Floyd E. Boyer the additional sum of $10,000 which Floyd E. Boyer received as a further credit on the amount unpaid on the check. That left still unpaid thereon the sum of $22,499.71. Towards its payment and as a dividend in the Vernon F. Kuhlmann bankruptcy proceeding in this court, Floyd E. Boyer received on

November 17, 1955 the sum of $3,365.05, and has received nothing further. And there still remains unpaid on the check and on the purchase price for the ninety-one cattle the sum of $19,134.66.

In the ledger volume mentioned in the opinion of March 1, 1958, appears the following memorandum:

"6–2 (91) Boyer 106230 $34,524.75"

It manifestly is meant to be a memorandum of the purchase of Floyd E. Boyer's ninety-one cattle.

As it did in the opinion of March 1, 1958, in relation to the other disputed sales of livestock, and especially those by Anker Petersen, Lyle Petersen and Lauritz M. Andersen, so with regard to the sale by Floyd E. Boyer, the court finds and concludes that the sale was made to Vernon F. Kuhlmann, doing business as Deshler Sales Company. A supporting, though in itself inconclusive, circumstance indicative of that conclusion is the readiness with which Vernon F. Kuhlmann took credit on the obligation for the item of $2,025.04 admittedly due to Deshler Sales Company. And the details of the purchase persuasively lead the court to the view that the Boyer cattle were bought by Vernon F. Kuhlmann, doing business as Deshler Sales Company. The court freely recognizes that there is evidence, including direct testimony by Vernon F. Kuhlmann, which supports the contrary view. But it believes from the whole record and, in substantial part from considerations discussed in the opinion of March 1, 1958, that the operations of Vernon F. Kuhlmann here under scrutiny were engaged in in the capacity in which he was lawfully authorized to be a buyer at Deshler Sale barn.

It necessarily follows that the unpaid portion of the sale price for the Boyer cattle, namely $19,134.66 must be and is added to the sum of the several other items already found to be entitled to the protection of the bond of defendant, Hartford Accident and Indemnity Company. Naturally, that finding and conclusion do not directly enlarge the recovery already foreshadowed on the bond, since the other protected items already substantially exceed the penal sum of the bond. But the finding and conclusion in behalf of Floyd E. Boyer do sustain his right to share proportionately in the distribution of such sum as shall be paid on the bond and on the judgment based upon it.

With direct reference to the prayer for an award against defendant, Hartford Accident and Indemnity Company of an attorneys' fee for services rendered in behalf of plaintiff's attorneys in this case, evidence has now been received. From that evidence the court finds that the firm of attorneys known as Healey, Davies, Wilson and Barlow, and principally Mr. Healey, the senior member of the firm, have represented the plaintiff trustee in this controversy with defendant, Hartford Accident and Indemnity Company, continuously since September, 1952; that they have prepared the many pleadings in this litigation in plaintiff's behalf; that they have attended and participated in the several preliminary hearings, in the pretrial conference, and in the eventual trial on the merits of the action, and have prepared and submitted typewritten briefs and oral arguments in the litigation; and that the fair and reasonable value of their service as such attorneys is the sum of $7,925; and that that value is firmly correct notwithstanding the fact that, after the institution, and throughout the pendency, of this case, most of the individual claimants in it were represented by other counsel of their own choice.

Upon the question, reserved until now, whether, and if so from what date, the recovery against defendant, Hartford Accident and Indemnity Company, should bear interest, the court has considered the authorities submitted by counsel in the light of the facts as proved in the litigation. And it has concluded that, whether the point be ruled by the law of Nebraska, Mullen v. Morris, 43 Neb. 596, 62 N.W. 74; O'Shea v. North American Hotel Company, 109 Neb. 317, 191 N.W. 321; City of Scottsbluff v. South-

ern Surety Company, 124 Neb. 260, 246 N.W. 346; or by the law generally administered in the United States, 8 Am. Jur. 740; 30 Am.Jur. 12, interest should be awarded on the amount recoverable on the bond at the lawful rate of six per cent per annum from June 11, 1952 until the same shall be paid. To the suggestion that the already indicated amount of recovery is the full amount of the bond's penal sum, beyond which recovery ought not to be allowed, it may be answered that the defendant, Hartford Accident and Indemnity Company, has at all times possessed the right of terminating the accrual of interest by the payment of the amount of its bond. It has elected not to do so, and may not cast on others the responsibility for the running of interest on its obligation. No attempt has been made to impose upon the defendant, Hartford Accident and Indemnity Company, any obligation for interest on each individual claim within the protection of its bond. The suit is not directly upon those claims, but upon the bond itself, and this is true despite the fact that, to support recovery on the bond, proof must be and has been made of damages sustained by the several claimants. And from the evidence, June 11, 1952 appears to be the date by which claims had accrued adequate to sustain recovery of the bond's penal sum. It is, indeed, possible that a day or two earlier than that may easily be supportable as the critical date. But, even if that be true, the disparity is trivial.

█ The court is also of the opinion that, under the law of Nebraska, Section 44–359, R.R.S.Neb., 1943, 1952 Reissue, an attorney's fee should be allowed to the plaintiff and taxed as a part of the costs in the entry of judgment in this case, and that the allowance should be in the sum already indicated. Swisher v. Fidelity & Casualty Company, 113 Neb. 592, 204 N.W. 383; Luikart v. Flannigan, 130 Neb. 901, 267 N.W. 165; State ex rel. School District of Scottsbluff v. Ellis, 160 Neb. 400, 70 N.W.2d 320. And that is true, even though the action was brought in this court, rather than in a state court of Nebraska. People of Sioux County, Nebraska v. National Surety Company, 276 U.S. 238, 48 S.Ct. 239; 72 L.Ed. 547; Missouri State Life Insurance Company v. Jones, 290 U.S. 199, 54 S.Ct. 133, 78 L.Ed. 267; Cohen v. Beneficial Industrial Loan Corporation, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528. In arriving at the conclusion announced in this paragraph, the court has limited its thinking solely to the question whether the trustee plaintiff has the right to the recovery, as a part of the costs of the action, and against the defendant, Hartford Accident and Indemnity Company, of a fee for his attorney. It has not reached, and does not discuss, the other and quite different problem, which is not now presented, whether, as against the beneficiaries of his trust he might be entitled to an award on account of the expenses of litigation whereby a fund distributable to such beneficiaries has been recovered or protected.

Judgment will accordingly be made and given in favor of W. O. Baldwin, Trustee, for the use of all persons beneficially protected under the bond in suit, in proportion to their respective interests therein, and against defendant, Hartford Accident and Indemnity Company, a corporation, for $52,000, together with interest thereon at the rate of six per cent per annum from June 11, 1952 until the same shall be paid, together with the costs of this action, including the sum of $7,925 allowed to the plaintiff and taxed as an attorney's fee. And the court retains jurisdiction over the case for the entry of such other and further orders or judgments as may be necessary or appropriate and particularly incident to the distribution by the plaintiff, as trustee of the proceeds of the judgment now announced among the persons respectively entitled thereto.

Plaintiff's counsel will forthwith prepare and submit for signature and entry a judgment in accordance with the announcements of the opinion of the court

herein of March 1, 1958, and of this memorandum. The judgment shall be so prepared as to speak as of the date of its signature and entry.